IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

PALIXATH XABANDITH,

Petitioner,

vs.

ROY CASTRO,

Respondent.

_________________________________/

06-cv-01380-ATG (HC)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Palixath Xabandith, a California prisoner, seeks a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his 2003 conviction and sentence for assault with a deadly weapon and assault with a firearm. Xabandith bases his request for relief on: (1) insufficient evidence to support his conviction and gang allegations, (2) erroneous admission of evidence, and (3) unconstitutional imposition of upper term sentence for attempted murder. After considering the Petition, Respondent's Answer, Petitioner's Traverse, and supporting documents submitted by the parties, the Petition is denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The statement of facts is from the unpublished opinion of the California Court of Appeal[1]:

---

[1] The factual findings of the California Court of Appeal are presumed correct, because

> This is not a case of conflicting eyewitness accounts. It is remarkable only for what no one saw. No one testified there was any provocation for the beating or for the shooting. No one testified the victim threw gang signs, "mad dogged" the patrons at the bar, showed any disrespect to the ECC, or challenged defendants to a fight. No one testified they saw who shot Chanthala Banemanyvong. No one heard anyone yell out "ECC" or claim gang affiliation.
>
> The witnesses did agree, however, on a general chronology of events leading up to the shooting. Banemanyvong arrived at a bar on El Camino Avenue in Sacramento at approximately 11:00 p.m. on August 11, 2001. Three friends, all of whom had been drinking beer before they arrived at the bar, accompanied him. Banemanyvong sat down at a table with a friend, Bounloth Chandra, who was also known as Loddi. Aware that a group of Laotian men were giving him "mean look[s]" and "mad-dogging" him, Banemanyvong decided to go outside to smoke a cigarette.
>
> Defendants followed him out of the bar. Holding what appeared to be either a beer bottle or beer can, defendant Phothrirath asked Banemanyvong where he was from or what gang he was from. Banemanyvong responded that he was from Chico. Phothirath then asked, "You know where you at?" and Banemanyvong said he was on El Camino. Phothirath threatened, "I'm going to shoot you." Loddi, who knew both defendants, tried unsuccessfully to intervene and abort a confrontation. Phothirath hit Banemanyvong, splitting open his chin. Loddi heard a bottle crack.
>
> Defendants both jumped Banemanyvong and began beating him. He ran around a car in the parking lot, ducking and trying to get away, bleeding badly from his chin. One of his friends tried to intervene but was stopped by one of the bystanders. During a momentary break in the action, Loddi went inside the bar to use the bathroom and Banemanyvong tried to collect himself by the front door of the bar.
>
> When Banemanyvong and his friend heard shots behind them, they ran across the street to an open field. Bleeding profusely, Banemanyvong realized he had been shot. He suffered two gunshot wounds, one in his abdomen and one in his back, had a total of three surgeries, and had to wear a colostomy bag. He had a blood alcohol level of .196 percent.

Lodged Document 3 at 2-3.

A jury convicted Xabandith of assault with a deadly weapon, Cal. Penal Code § 245(a)(1); attempted murder, Cal. Penal Code §§ 187, 664; and assault with a firearm, Cal. Penal Code § 245(a)(2). His crimes were enhanced because they were committed with intent to promote criminal conduct by gang members, Cal. Penal Code § 186.22(b)(1), and Xabandith intentionally discharged a firearm, Cal. Penal Code § 12022.53. Xabandith was sentenced to

---

Xabandith has not challenged their accuracy. 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

state imprisonment for nine years plus twenty-five years to life.

The California Court of Appeal, Third Appellate District affirmed, and the California Supreme Court denied Xabandith's petition for review on October 19, 2005. Xabandith has exhausted his state grounds for relief.[2] In his federal habeas petition, Xabandith challenges his conviction and sentence on the bases of insufficient evidence, erroneous instructions, erroneous admission of evidence, and excessive sentence.

## II. ANALYSIS

A. Review Standards

Because Xabandith's petition was filed after April 24, 1996, his claims adjudicated on the merits by a state court are governed by the deferential review standard established in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). This court cannot grant relief from the state court decision unless the decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). Where there is no reasoned decision from the highest state court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A state court decision may result in a decision that is "contrary to" established federal law if it "applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). "'[C]learly established Federal law'" is defined as "the governing legal principle or

---

[2] "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies . . . ." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing 28 U.S.C. § 2254(b)(1)). A federal claim is exhausted when it has been presented to the state courts, giving the state courts the opportunity to correct alleged violations of a prisoner's federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995).

principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting 28 U.S.C. § 2254(d)(1)). Under the deferential § 2254(d) standard, state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

B. Gang Enhancement and Jury Instructions

Xabandith argues that there is insufficient evidence to support his gang affiliation or enhancement (claim one) and that the jury was misinstructed as to his gang enhancement (claims two and three). Although the gang enhancement requires two predicate offences to be proved, Xabandith contends that only one was shown. He presented these claims to the state court of appeal on direct review, which denied these claims on the merits and to the California Supreme Court, which denied review.

Regarding gang affiliation and enhancement, the state appellate court determined:

> Xabandith was charged with three gang enhancements under the Street Terrorism Enforcement and Prevention Act. (Pen. Code, § 186.20 et seq.) "[T]o subject a defendant to the penal consequences of the STEP Act, the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period."

Lodged Document 3 at 4 (quoting *People v. Gardeley,* 14 Cal. 4th 605, 616-17 (1996)) (internal citation and footnote omitted).

To prove the gang enhancements, the prosecution called an expert witness on Asian street gangs. The expert testified that "ECC is a criminal street gang" of "primarily Laotian membership" with approximately "20 active members" who "claim the color blue, the Del Paso Heights area as their turf, and an identifying symbol of 366." *Id.* at 5. "ECC gang members have committed murder, drive-by shootings, vehicle theft, burglaries, possession of firearms, illegal possession of knives, drug sales, drug possession, assault with a deadly weapon, and

assault with a firearm." *Id.*

The appellate court determined that the evidence sufficiently supported the gang enhancement. Eyewitnesses testified that Xabandith aided and abetted Phothirath's assaulting the victim with a deadly weapon and that he beat and kicked the victim. "Although no one saw who actually pulled the trigger, there was strong circumstantial evidence to suggest that Phothirath shot Banemanyvong since he had threatened to do so and witnesses saw what appeared to be a gun in his pants." *Id.* at 7. The gang expert also provided the jury with a motive for the assault with a deadly weapon, which was to enhance the reputation of ECC by acts of violence demonstrating that ECC was a gang to be feared.[3] The appellate court concluded that

> there was substantial evidence that ECC was a criminal street gang comprised of members who engaged in a pattern of criminal activity to promote, further, and benefit the gang. Furthermore, the evidence supports the jury's finding that on the night of August 11, 2001, defendants committed three substantive crimes apiece so as to further benefit their gang.

*Id*. at 8.

Regarding the predicate offenses, the appellate court determined that

> Defendants were both charged with and convicted of a total of six offenses, any one of which could serve as the second predicate offense to demonstrate a pattern of gang activity. Moreover, the jury found that these crimes were committed with the intent to promote criminal conduct by gang members.
> . . . .
> Although the prosecution may have failed to prove that Nattasin's possession qualified as a predicate offense, it certainly presented more than sufficient evidence to prove at least two predicate offenses to establish the requisite pattern of criminal conduct.

*Id.* at 7, 8.[4]

---

[3] At trial, the expert testified about a letter written by an incarcerated ECC member to Xabandith that encouraged him to commit violent acts to restore the faltering view of the ECC gang. Lodged Document 5 at 840-46.

[4] Two predicate offenses identified by the expert were: (1) as retaliation, "ECC gang member Steven Khamkeuanekeo shot at some Samoan men he believed had assaulted his brother" and "was convicted of assault with a firearm," and (2) "Xabandith's brother Nattasin, a validated ECC member, was found in possession of a firearm on September 12, 2000." Lodged Document 3 at 5. Because Nattasin was a minor at the time of his crime, Xabandith contends that "the prosecution failed to prove that Nattasin's possession qualified as a predicate offense."

The state appellate court recognized that the California Supreme Court has held "that the charged offense can serve as a predicate offense to establish a pattern of criminal gang activity." *Id.* at 6 (citing *People v. Loeun*, 17 Cal. 4th 1, 5 (1997); *Gardeley*, 14 Cal. 4th at 625). Xabandith contended that the court's instructing the jury that Khamkeuanekeo's assault with a firearm and Nattasin's firearm possession "were the predicate gang offenses" deprived him of due process, because the jury was improperly instructed on gang enhancements in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). *Id.* The appellate court, however, determined that any instructional error as to the predicate offenses was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967):

> The court properly instructed the jury on each of the elements of assault with a deadly weapon, attempted murder, and assault with a firearm. The jury thereafter convicted both defendants of these offenses, which, according to section 186.22, subdivision (e)(1), (3) qualify as predicate offenses. Thus, . . . the jury made the requisite factual findings, albeit in the context of the substantive offenses rather than the in the context of the enhancement. Since those same factual findings support the gang enhancement, the instructional error was harmless beyond a reasonable doubt.

Lodged Document 3 at 6-7.

In reviewing challenges to sufficiency of the evidence, a federal habeas court determines if, in "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (citation and internal quotation marks omitted). Claims raised in § 2254 proceedings as to sufficiency of the evidence are decided with reference to state law. *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979). For Cal. Penal Code § 186.22 to apply, "the prosecution must prove that the crime for which the defendant was convicted had been committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." *People v. Villegas*, 92 Cal. App. 4th 1217, 1227 (2001) (citation and internal

---

*Id.* The Attorney General, however, argued Xabandith's "convictions of assault with a firearm to satisfy the statutory requirement of two predicate offenses." *Id.*

quotation marks omitted). Where the evidence would support conflicting inferences, "the federal court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (citation and internal quotation marks omitted).

Under AEDPA, a federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the *Jackson*, state-law standard when reviewing the petitioner's claim. *Juan H. v. Allen*, 408 F.3d 1262, 1274 n.12 (9th Cir. 2005); *see Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (recognizing that "unreasonable application" standard applies to insufficient evidence claim). In this case, the state appellate court stated the gang elements that must be proved under California law, recognized that charged crimes may be predicate offenses for gang enhancement, and noted that the jury found the gang enhancements true beyond a reasonable doubt, despite instructional error, which was harmless. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that Xabandith's assault and attempted murder of Banemanyvong were committed to promote the reputation of the ECC gang. *Jackson*, 443 U.S. at 319.

B. Convictions and Aider-and-Abettor Instructions

Xabandith argues that there was insufficient evidence to support his convictions for attempted murder and assault with a firearm (claim four) and that the jury instructions regarding aider and abettor liability (claims five and six) were incorrect. He specifically contends that there was insufficient evidence to show that the crimes for which he was convicted were the natural and probable consequences of assaulting Banemanyvong with a beer bottle or can. The state appellate court denied these claims on the merits, and the California Supreme Court denied review.

In addressing Xabandith's contentions about his liability as an aider and abettor, the state appellate court explained:

[Xabandith's] arguments are premised on a vision of human behavior entirely

> divorced from the realities of the gang culture. The jury, however, had the prerogative to *draw reasonable inferences from the circumstantial evidence* surrounding the commission of the crimes and, based on its understanding of gang psychology and sociology, to find that the shooting was a natural and probable consequence of the unprovoked violence Xabandith and Phothirath instigated.
>
> . . . .
>
> [W]e reject Xabandith's premise that there is no evidence he saw the gun or heard Phothirath's threat. It is true that there is no direct evidence as to what he saw and heard. But witnesses in close proximity to Xabandith saw a bulge in Phothirath's pants that appeared to be a weapon and clearly heard him threaten to shoot the victim. The jury was free to draw the reasonable inference that Xabandith, too, heard the threat and was aware his confederate was armed.
>
> Moreover, the jury was also free to reject Xabandith's feigned naivete. He is a validated gang member of the ECC. He has at least two brothers who are also members of the gang. He received mail from an imprisoned gang member entreating him to help ECC return to prominence. . . . To a seasoned gang member, well acquainted with the use of violence to achieve stature on the street, a shooting was a reasonably foreseeable consequence of a street brawl that had begun with an assault with a beer bottle.
>
> . . . .
>
> The chronology of events was consistent with the typical escalation of violence in gang confrontations. Defendants approached the victim and, using familiar gang vernacular, asked him where he was from. The gang expert testified that defendants' confrontational behavior from the outset indicated they were going to do something to the victim when they first approached him. Translating for the jury, the expert explained that defendants' challenge signified they were looking for a fight, and the unprovoked attack bolstered their reputation as a gang to be feared. From these challenges, the encounter escalated into a beating and finally the shooting. . . . [T]here was ample evidence from which the jury could reject those theories and accept the prosecutor's theory that the shooting was the natural and probable consequence of the assault and beating.

Lodged Document 3 at 8-9, 11-13.

After considering "*'all of the evidence'* . . . in the light most favorable to the prosecution," a state court conviction will be upheld, if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Wright v. West*, 505 U.S. 277, 296 (1992) (quoting *Jackson*, 443 U.S. at 319); *see People v. Hatch*, 22 Cal. 4th 260, 272 (2000) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (citation and internal quotation marks omitted)). Under California law, an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets."

*People v. Prettyman*, 14 Cal. 4th 248, 261 (1996) (citation and internal quotation marks omitted). The jury must find that the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted. *Id.* at 262; *see People v. Montes*, 74 Cal. App. 4th 1050 (1999) (recognizing that, in gang conflicts, verbal taunting can escalate to physical violence and gunfire). Xabandith's conviction as an aider and abettor for attempted murder and his assault with a firearm of Banemanyvong is supported by the evidence as reasonable and foreseeable crimes sufficient to uphold the jury's conviction.

Xabandith also challenges the jury instructions that state that the jury "must find" the elements of being an aider and abettor. Regarding this issue, the state appellate court determined:

> Nor do we accept Xabandith's contention that by instructing the jury it "must find" all of the elements of being an aider and abettor and of the natural and probable consequences doctrine, the trial court deprived him of his constitutional right to have the jury make the requisite factual findings.
>
> The court instructed the jury on the principles of aiding and abetting liability, including an explanation of the natural and probable consequences doctrine. The court specifically directed the jury that "[i]n order to find this defendant guilty of the crime of attempted murder and/or 245A(2), assault with a firearm, as charged in Count Two and Three, you must be satisfied beyond a reasonable doubt . . . ." The court thereafter articulated [five] specific factors the jury must have found beyond a reasonable doubt.
>
> . . . .
>
> "The trier of fact *must find* that the defendant, acting with, one, knowledge of the unlawful purpose of the perpetrator, and, two, with the intent or purpose of committing, encouraging, or facilitating the commission of a target offense, in this case the 245A(1), assault with a bottle or GBI, force likely to produce GBI; three, by act or advice, aided, promoted, encouraged, or instigated the commission of that target crime, but the trier of fact *must also find* that the defendant, number four, the defendant's confederate committed an offense other than the target crime; and, five, the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.
>
> . . . .
>
> Xabandith objects to the italicized language quoted above because, he contends, it diluted the prosecution's burden of proving each element beyond a reasonable doubt. . . . [A] reasonable juror would not interpret the language as a dilution of the burden of proof. Rather the italicized language merely identified the five elements the jury had to find in order to hold defendant liable on an aiding and abetting theory. We reject Xabandith's strained and improbable interpretation of the isolated portion of the instructions . . . .

Lodged Document 3 at 13-15.

Under California law, the adequacy of jury instructions is reviewed to decide whether

the trial court "fully and fairly instructed on the applicable law." *People v. Partlaw*, 84 Cal. App. 3d 540, 558 (1978). "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." *People v. Yoder*, 100 Cal. App. 3d 333, 338 (1979) (citation and internal quotation marks omitted). The state trial court correctly instructed the jury concerning the elements of the crimes with which Xabandith was charged as well as aider and abettor liability. The appellate court held that Xabandith's "must find" argument was implausible. That court's denial of this claim is consistent with *Jackson,* which forecloses habeas relief.

C. Admission of Incarcerated Gang Member's Letter

Xabandith argues that the trial court erred in admitting as an exhibit a letter, written to him by an incarcerated ECC gang member five months prior to the attempted murder (claim 7). The letter urges Xabandith to commit crimes to reinstate the reputation of ECC. Xabandith contends that admission of this letter violated California law, his right to cross-examine the author, and due process.

In rejecting this claim, the state appellate court explained:

> Xabandith contends the trial court abused its discretion by admitting a letter written to him by an imprisoned ECC member. In the letter, the author lamented the decline of the gang and encouraged Xabandith to commit crimes to strengthen gang unity and to reestablish the gang's reputation. Xabandith kept the letter in his bedroom in a box labeled ECC and "hide this."
>
> . . . .
>
> He claims the letter is testimonial because "[i]t is a somber letter written by an older gang member in prison to a younger gang member that formally sets forth the goals, hopes and ambitions for himself and his gang."
>
> . . . .
>
> The author's perspective on the potential disintegration of the gang, cloistered as he was in the confines of his cell, was not the functional equivalent of ex parte in-court testimony. . . . Simply put, the letter did not constitute testimony.
>
> Nor . . . did it constitute hearsay. The prosecution did not introduce the letter for the truth of the matters asserted by the author. [T]he prosecution was not attempting to prove whether the gang had fallen into disrepute. Rather, the letter was admitted to prove motive and intent. It was evidence that Xabandith might have believed the gang's stature on the streets was diminishing and the members were becoming involved in other gangs. That information . . . could have motivated Xabandith to initiate or to participate in a violent confrontation to bolster the gang's reputation and help it reclaim a loyal following. Moreover, the author had directed Xabandith to destroy the letter if he did not intend to

> comply with the exhortation to violence. Since he . . . kept the letter, the prosecution could argue he intended to become involved in criminal conduct to enhance the image and well-being of the gang. Because the letter was introduced for purposes other than establishing the truth of the matter asserted, it was not hearsay.
>
> Nor can we find any abuse of discretion. There is no question the letter was prejudicial. The jury became well acquainted with the goals and aspirations of an older gang member and his affectionate counseling of his younger "homie." The jury could reasonably infer that Xabandith followed the advice. But the question is not whether the evidence is prejudicial, for any evidence that puts a defendant in a bad light can be said to be prejudicial, but whether the evidence is unduly prejudicial.
>
> . . . .
>
> [W]e cannot say the trial court abused its discretion by concluding that the evidence was substantially more probative than prejudicial.

Lodged Document 3 at 15-16, 17, 18.

The admissibility of evidence in a state criminal trial does not offend constitutional due process under federal habeas review unless admission of the evidence was so prejudicial that it rendered the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991).[5] The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). Applying *Crawford*, the state court reasonably concluded that the jury could infer Xabandith's motive for committing the charged crimes, which forecloses habeas relief for the state court's denial of this claim. 28 U.S.C. § 2254(d)(1).

D. <u>Upper Term Sentence for Attempted Murder</u>

In his eighth and final claim, Xabandith argues that the state trial court's imposition of the upper term for his attempted murder conviction was constitutional error because it violated his right to have a jury find each fact of his conviction beyond a reasonable doubt. On direct appeal, the California Court of Appeal upheld Xabandith's upper term sentence, based on *People v. Black*, 35 Cal. 4th 1238 (2005) (*Black I*), *overruled in part*, *People v. Black*, 41 Cal.

---

[5] Xabandith's argument that the state court's decision was contrary to California Evidence Code § 352 is not cognizable on federal habeas review. 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 67-68.

4th 799 (2007) (*Black II*), and the California Supreme Court denied his petition for review. *Black I* had determined that California's upper term sentencing procedure was constitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakley v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005).

In *Cunningham v. California*, 549 U.S. 270 (2007), the Supreme Court held that California's procedure for selecting upper term sentences violated a defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." *Id.* at 274. In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court held that a new rule of constitutional law cannot be applied retroactively on federal collateral review to upset a state conviction or sentence unless the new rule forbids criminal punishment of primary, individual conduct or is a watershed rule of criminal procedure. Although the Court now has clarified that California's upper term sentencing violates the Sixth Amendment, because *Cunningham* does not fit the two exceptions,[6] granting relief to Xabandith inappropriately would require retroactive application of a new rule under *Teague*. *See Whorton v. Bockting*, 549 U.S. 406, 417 (2007) ("The 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." (citation and internal quotation marks omitted) (omission in original).

In addition, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*[*v. Abrahamson*, 507 U.S. 619 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). An error is harmless if it does not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation and internal quotation marks omitted). Habeas relief is unwarranted unless "it is reasonably probable that a

---

[6] The first *Teague* exception is inapplicable because the *Cunningham* rule does not place conduct beyond the reach of criminal law or "decriminalize a class of conduct." *Saffle v. Parks*, 494 U.S. 484, 495 (1990). Neither is the *Cunningham* rule a watershed exception, because "we cannot confidently say that judicial factfinding *seriously* diminishes accuracy." *Schriro v. Summerlin*, 542 U.S. 348, 356 (2004).

result more favorable to the appealing party would have been reached in the absence of the error." *Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000) (citation and internal quotation marks omitted). Because a single aggravating circumstance is sufficient to authorize the imposition of the upper term sentence, *Cunningham* error is harmless if the federal habeas court determines that it is reasonably probable that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. *People v. Sandoval*, 41 Cal. 4th 825, 838, 839 (2007) (noting that, if a jury finding would have been made on "at least a single aggravating circumstance," then the *Cunningham* error is harmless because "the jury's verdict would have authorized the upper term sentence").

The trial court's reasons for imposing Xabandith's upper term sentence resulted from uncontested or overwhelming evidence. It was undisputed that Xabandith had prior convictions and was on probation at the time he attempted murder for which he was charged. *See Cunningham*, 549 U.S. at 275, 282, 289 (citing cases establishing that selection of a sentence based on a defendant's prior convictions does not violate the Sixth Amendment). The jurors would have found these aggravating factors if they had been asked to render a verdict on them, and the upper term would have been authorized on either of these factors. Therefore, Xabandith's upper term sentence was not a *Cunningham* error. Moreover, even if it had been error, it was harmless under *Brecht*, since there were undisputed aggravating factors.

**III. CONCLUSION**

For the reasons explained herein, Xabandith's § 2254 petition is DENIED.

Dated: August 12, 2009

/s/ Alfred T. Goodwin

ALFRED T. GOODWIN.
United States Circuit Judge
Sitting by designation